# EXHIBIT 3

11/13/2020 2:56 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 48088208
By: Carolina Salgado
Filed: 11/13/2020 2:56 PM

C. A. No. _____

| | |
|---|---|
| **CHEE LEE,** | **IN THE DISTRICT COURT FOR** |
| **Plaintiff,** | |
| **v.** | **HARRIS COUNTY, TEXAS** |
| **ACADEMY, LTD., d/b/a ACADEMY SPORTS & OUTDOORS,** | **_____ Judicial District** |
| **Defendant.** | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Chee Lee ("Lee" or "Plaintiff"), by and through his attorney of record, hereby complains of Academy, Ltd., d/b/a Academy Sports & Outdoors ("Academy"), and for cause of action would respectfully show this Honorable Court the following:

### 1.    INTRODUCTION

1.1.    This suit is brought pursuant to Rule 190.3 of the Texas Rules of Civil Procedure and is to be administered under Discovery Control Plan Level 2.

1.2.    Plaintiff demands a JURY TRIAL in this case as to any and all issues triable to a jury.

1.3.    This action seeks actual damages, compensatory damages, expert witness fees, court costs, attorney's fees, and pre-judgment and post-judgment interest.

### 2.    PARTIES & PERSONAL JURISDICTION

2.1.    Plaintiff Lee is a resident of Harris County, Texas.

2.2.    Defendant Academy, Ltd. is a domestic corporation headquartered in Harris County, Texas. Defendant may be served with process through its registered agent, Delilah Banks, 1800 North Mason Road, Katy, Texas 77449.

3.    <u>VENUE</u>

3.1    Venue of this proceeding is proper in Harris County, Texas, pursuant to Texas Civil

Practice & Remedies Code §15.035 because Harris County, Texas is the county in which

all or part of transactions, acts and omissions giving rise to the claims occurred.

4.    <u>SUBJECT MATTER JURISDICTION</u>

4.1    The amount in controversy exceeds the minimum jurisdictional limits of this Court.

Pursuant to Rule 47(c) of the Texas Rules of Civil Procedure, the monetary relief sought

is over $200,000 but not more than $1,000,000.

5.    <u>FACTS</u>

5.1.    Academy hired Chee Lee in 2009 in the role of Senior Manager, Financial Planning &

Analysis. Academy promoted Lee multiple times over the next 11 years. At the time of

his termination on November 9, 2020, Lee held the position of Senior Director, Financial

Planning & Analysis.

5.2.    On or about May 25, 2012, Lee and Academy signed an employment contract ("the

Agreement") governing the terms of his employment going forward. *See Associate*

*Employment Agreement,* attached as Exhibit A to Plaintiff's Original Petition.

5.3.    Per Paragraph 1 of the Agreement, the Agreement was in place for an initial two year

Term and automatically renewed "under the same terms and conditions for successive

one year Terms, subject to termination in accordance with this Agreement." *Exhibit A* at

1.

5.4.    Paragraph 9.4 of the Agreement provided for termination by Academy without cause,

conditioned on the payment of the following: (1) "Incentive Compensation  which

Associate earned according to its terms (other than any requirement to be employed by

2

Academy on the date the payment is made) for the portion of the final fiscal year of his/her employment in an amount pro-rated through the date of termination"; (2) a "one-time lump sum payment (the "Severance Payment"), paid no later than 90 days after Associate's termination date, equal to … for Associates with seven (7) full years of service or more, one month's Base Salary for each year of service up to a maximum of the Associate's Base Salary." *Exhibit A at 4-5.*

5.5.    Paragraph 9.3 of the Agreement specifies the situations in which Lee could be terminated for cause. *Exhibit A* at 4.

5.6.    Lee was paid additional compensation in the form of several grants of stock options during his employment with Academy, subject to the terms of the Unit Options Award Agreement ("the Award Agreement"). *See Unit Options Award Agreement*, attached as Exhibit B.

5.7.    Per the terms of the Award Agreement, Lee was entitled to exercise his options for up to 180 days after termination, if he was terminated without cause. *Exhibit B* at 5. However, if terminated for cause, Lee lost the right to exercise his stock options. *Id.*

5.8.    Lee performed all of his duties under the Agreement without fail. In August 2020, Academy awarded Lee a special bonus for exceptional contributions to Academy.

5.9.    On November 9, 2020, Academy terminated Lee for cause.

5.10.   Academy did not have cause to terminate Lee as defined under the Agreement. According to Academy's termination letter, Lee was terminated "as a result of our investigation into your recent actions and statements."

5.11.   Because Academy did not have cause to terminate Lee under the Agreement, Lee was entitled to his prorated bonus for 2020 and 11 months Base Salary under the terms of the

Agreement, and to exercise his stock options at any time until 180 days after his termination, under the terms of the Award Agreement. Accordingly, Defendant breached its contract with Lee.

5.12.  Defendant's breach of the contract denied Lee the benefits of his contract, including severance pay, bonus, and vested stock options, to which he was entitled under his contract with Defendant.

## 6.  CAUSE OF ACTION: BREACH OF CONTRACT

6.1.  Plaintiff incorporates by reference all preceding facts as set forth in Paragraphs 5.1 through 5.12.

6.2.  There was a valid, enforceable contract between Plaintiff and Defendant.

6.3.  Plaintiff has standing to sue for breach of contract.

6.4.  Plaintiff performed under his agreement.

6.5.  Defendant breached its agreement with Plaintiff.

6.6.  Defendant's breach of the agreement caused Plaintiff damages.

6.7.  Plaintiff requests that the Court award him severance, bonus, and stock options due under the Agreement and any other relief that Plaintiff may be entitled to, in law or in equity.

## 7.  JURY DEMAND

7.1.  Plaintiff hereby makes his request for a jury trial in this cause pursuant to Rule 216 of the Texas Rules of Civil Procedure and deposits with the District Clerk of Fort Bend County, Texas the jury fee.

## 8.  ATTORNEYS' FEES

8.1  As a result of this action, Plaintiff has retained the law firm of Shellist Lazarz Slobin LLP, to represent him in his claims against Defendant.  Accordingly, Plaintiff seeks

attorneys' fees incurred pursuant to Texas Civil Practice & Remedies Code Chapter 38. All demands for payment under the breach of contract claim will have been made greater than 30 days before trial.

## 9.  PRAYER

9.1.    Plaintiff respectfully prays for the following relief:

 i.  Judgment against Defendant, for actual damages sustained by Plaintiff as alleged herein;

 ii.  Grant Plaintiff damages caused by the Defendant's breach of contract;

 iii.  Consequential damages;

 iv.  Attorneys' fees;

 v.  Pre-judgment interest at the highest legal rate;

 vi.  Post-judgment interest at the highest legal rate until paid;

 vii.  All trial costs; and

 viii.  Such other and further relief, at law or in equity, general or special to which Plaintiff may show he is justly entitled.

5

Respectfully submitted,

SHELLIST LAZARZ SLOBIN LLP

*/s/ Dorian Vandenberg-Rodes*
Todd Slobin
State Bar No. 24002953
tslobin@eeoc.net
Dorian Vandenberg-Rodes
State Bar No. 24088573
drodes@eeoc.net
11 Greenway Plaza, Suite 1515
Houston, Texas 77046
(713) 621-2277 (Tel)
(713) 621-0993 (Fax)

ATTORNEYS FOR PLAINTIFF



Associate Employment
Agreement

Version 050712-1

This Associate Employment Agreement ("Agreement") is entered into on the date executed by both Parties (the "Effective Date") between Academy Ltd., d/b/a Academy Sports + Outdoors ("Academy") and Chee Lee ("Associate"). Academy Ltd. is Associate's employer, but for all other aspects of the Agreement, the term "Academy" includes its subsidiaries and affiliates. Academy and Associate may sometimes be referenced herein individually as a "Party" or collectively as the "Parties."

**WHEREAS,** Academy desires to employ Associate and Associate desires to work for Academy; and

**WHEREAS,** Associate will have access to Academy's Confidential Information and Relationships (as defined herein) during the Associate's Term of employment;

**WHEREAS,** Academy desires to protect its Confidential Information and Relationships, and Associate agrees to do so under the terms of this Agreement;

**NOW THEREFORE,** for good and valuable consideration given by each Party to the other, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## EMPLOYMENT AND DUTIES

1.   <u>Term</u>.  Academy agrees to employ Associate and Associate agrees to be employed by Academy, subject to the terms and conditions of this Agreement, for an initial term beginning on the Effective Date and continuing for two (2) years (this initial term and any subsequent term are referred to as a "Term"). After this initial Term, this Agreement shall automatically renew under the same terms and conditions for successive one-year Terms, subject to termination in accordance with this Agreement.

2.   <u>Position</u>.  Academy is employing Associate in a specific position designated by Academy, or in such other positions as the Parties mutually may agree.  Associate shall diligently perform the duties and services consistent with the position, as determined and directed by Academy.  In performing the duties under this Agreement, Associate will at all times act in conformity with the directives, policies, and codes of conduct of Academy.

3.   <u>Duties of Fiduciary and of Loyalty</u>.  Associate acknowledges and agrees that, at all times during employment, Associate owes fiduciary duties to Academy, including but not limited to duties of loyalty, fidelity, and allegiance; to act at all times in the best interests of Academy; to make full disclosure to Academy of all information pertaining to Academy's business and interests; to do no act which would injure Academy's businesses, its interests, or its reputation; and to refrain from using for Associate's own benefit or for the benefit of others any information or opportunities pertaining to Academy's businesses or interests that are entrusted to Associate or that he/she learned while employed by Academy.  Associate acknowledges and agrees that, upon termination of employment, his/her fiduciary duties continue and Associate shall continue to refrain from using for his/her own benefit or the benefit of others, or from disclosing to others, any Confidential Information (as defined herein) or any opportunities pertaining to Academy's businesses or interests that were entrusted to Associate during the employment relationship or that he/she learned while employed by Academy or its predecessor.

1

**EXHIBIT A**



**4.**   Conflict of Interest.

**4.1**   Associate agrees, during the period of his/her employment by Academy, to comply with all ethics, conflict of interest, and code of conduct policies issued by Academy; devote his/her full business time, energy and best efforts to Academy's business and affairs; and not to engage, directly or indirectly, in any other activity which detracts from his/her commitment to Academy. Associate agrees that during his/her employment, he/she will not engage in any business for gain, profit or other pecuniary advantage that may conflict with Academy's business and affairs or interfere with Associate's performance of his/her duties and obligations hereunder, except with the prior disclosure to and written consent of Academy.  Associate agrees that any such direct or indirect interest in connection with, or any benefit from, any outside activities, particularly commercial activities, which might in any way adversely affect Academy, involves a possible conflict of interest.  In keeping with Associate's fiduciary duties to Academy, Associate agrees that during employment, Associate shall not knowingly become involved in a conflict of interest with Academy, or upon discovery thereof, allow such a conflict to continue.

**4.2**   Associate agrees that he/she shall disclose to Academy any facts which might involve such actual or potential conflict of interest.  The determination of whether an actual or potential conflict of interest exists shall be made by Academy in its sole discretion.  Some actual or potential conflicts of interest include, but are not limited to, any ownership of or any material relationship with any company which, directly or indirectly, does business with Academy or which competes with Academy, use of Academy resources for the benefit of any person or entity besides Academy, violation of any non-disclosure, non-solicitation or non-competition duties in this Agreement, acquiring or trading products the same or similar to those designed, manufactured or marketed by Academy, or usurping any corporate opportunity for Academy.

**4.3**   The Parties recognize and agree that Associate may engage in passive personal investments and charitable or public service activities and serve on the boards of directors of charities, to the extent that such activities do not conflict with Academy's business and affairs or interfere with Associate's performance of his/her duties and obligations hereunder.  Nothing in this Agreement shall be deemed to prevent Associate from owning securities of any publicly-owned corporation or entity in a business similar to the business of Academy, provided that the total amount of securities of each class owned by Associate in such publicly-owned corporation or entity does not exceed two percent (2%) of the outstanding securities of such class.

**4.4**   Associate represents that he/she has no current conflict of interest or obligation to any other person or entity (including non-disclosure, non-solicitation or non-compete obligations) which prevent him/her from performing his/her duties specified in this Agreement.  Associate represents that his/her performance of the duties under this Agreement shall not cause him/her to violate any duties or obligations owing to any other person or entity.

## COMPENSATION AND BENEFITS

**5.**   Base Salary.  Associate shall receive an annualized base salary to be paid according to Academy's normal payroll practices.  This salary will be subject to periodic review and adjustment by Academy at its sole discretion.

**6.**   Incentive Compensation.  Associate may participate in any bonus or incentive compensation plans ("Incentive Compensation") established by Academy in accordance with the terms and conditions

2



of such Incentive Compensation plans. The requirements for obtaining payment under such Incentive Compensation plans shall be established in writing by Academy. The terms, conditions, and interpretation of any such Incentive Compensation plans and determination of whether the requirements for payment have been met for Associate shall be made by Academy in its sole discretion. Any Incentive Compensation earned by Associate will be paid in accordance with Academy practice and the terms of the applicable Incentive Compensation plan. As a condition to receiving the Incentive Compensation, Associate must not be in default of the Agreement.

7.    Benefits. During the Term of this Agreement, Associate may receive benefits in accordance with the terms of any Academy plans and policies offered to Academy Associates.

8.    Indemnification. Academy agrees to defend, indemnify and hold harmless the Associate from any liability and expenses arising from the Associate's performance of his/her duties for Academy, so long as Associate's actions were taken in good faith for the benefit of Academy and within the scope of Associate's employment.

## TERMINATION OF EMPLOYMENT AND RELATED COMPENSATION

9.    Termination of Employment by Academy Prior to Expiration of Term. Academy shall have the right to terminate Associate's employment under this Agreement at any time and Associate shall have rights to certain payments, in accordance with the following provisions:

   9.1    Termination upon Death. Associate's employment will terminate upon his/her death. All of Associate's rights and benefits provided for in this Agreement will terminate on the date of death; *provided, however*, that Associate's estate will receive Associate's pro rata Base Salary as earned and unpaid through the date of death. Associate's estate also will be eligible to receive, at the same time as payments are made to other Associates of Academy, Incentive Compensation which Associate earned according to its terms (other than any requirement to be employed by Academy on the date the payment is made) for the portion of the final fiscal year of his/her employment in an amount pro-rated through the date of death, and for the fiscal year preceding the date of his/her death (if such Incentive Compensation from the previous fiscal year was not yet paid prior to death).

   9.2    Termination upon Disability. Upon Associate's becoming disabled, as determined by a physician selected by Academy or its insurer, under Section 409A of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations and other guidance promulgated with respect thereto ("Section 409A"), Associate's employment shall be terminated. All of Associate's rights and benefits provided for in this Agreement will terminate as of the date of such disability; *provided, however*, that Associate will receive Associate's pro rata Base Salary as earned and unpaid through the date of termination. Associate also will be eligible to receive, at the same time as payments are made to other Associates of Academy, Incentive Compensation which Associate earned according to its terms (other than any requirement to be employed by Academy on the date the payment is made) for the portion of the final fiscal year of his/her employment in an amount pro-rated through the date of termination, and for the fiscal year preceding the date of his/her termination (if such Incentive Compensation from the previous fiscal year was not yet paid prior to termination). Associate may also apply for any disability benefits which may be provided by Academy. Nothing in this provision should be interpreted as limiting any of Associate's rights under the Americans with Disabilities Act or comparable state or local law, including any right to a reasonable accommodation for any qualifying disability, as determined by

3



such laws. In the event of any conflict, any applicable law regarding disability accommodation for employees will prevail over this Section.

9.3    Termination by Academy for Cause. Associate's employment may be terminated for Cause as defined below and as interpreted at Academy's sole discretion. Associate's rights and benefits provided for in this Agreement will terminate as of such date; *provided, however,* that Associate will receive Associate's pro rata Base Salary as earned through the date of such termination. Upon termination for Cause, Associate shall receive no portion of any potential Incentive Compensation for the year when Associate is terminated, or for the prior fiscal year if that Incentive Compensation remains unpaid at the time of termination. Academy may terminate Associate's employment for Cause, at its sole discretion, if any of the following occurs:

   **a.**    Associate's act of dishonesty or disloyalty (including, but not limited to, fraud, misrepresentation, embezzlement or misappropriation);

   **b.**    Associate's material breach of this Agreement;

   **c.**    Associate's failure to timely or sufficiently perform any material and reasonable duties assigned to him/her;

   **d.**    Associate's failure to reach the material and reasonable goals set forth for Associate, including poor performance and/or failure to achieve an acceptable performance rating;

   **e.**    Associate's breach of any Academy policy, including but not limited to all employment, ethics, conflict of interest, and code of conduct policies;

   **f.**    Associate's drug or alcohol abuse;

   **g.**    Associate's conviction, guilty plea, no contest plea, deferred adjudication or other trial diversion regarding any felony or any crime involving moral turpitude; or

   **h.**    Associate's willful disregard of any material and reasonable directive, or material misconduct with respect to Academy's business or affairs, including any act or acts which adversely affect Academy's image or reputation or which result in material financial loss to Academy.

9.4    Termination by Academy without Cause. Associate's employment may be terminated by Academy, or Academy may elect not to renew the Agreement, at any time without Cause. All of Associate's rights and benefits provided for in this Agreement will terminate as of the date of termination; *provided however,* Associate shall receive Associate's pro rata Base Salary as earned and unpaid through the date of termination. Subject to Section 10.3, Associate also will be eligible to receive, at the same time as payments are made to other Associates of Academy, Incentive Compensation which Associate earned according to its terms (other than any requirement to be employed by Academy on the date the payment is made) for the portion of the final fiscal year of his/her employment in an amount pro-rated through the date of termination, and for the fiscal year preceding the date of his/her termination (if such Incentive Compensation from the previous fiscal year was not yet paid prior to termination). These Incentive Compensation payments (if any) will occur no later than two and one-half months following the end of the fiscal year for Academy during which each of such bonuses were earned. Further

4



Associate shall receive, subject to Section 10.3, a one-time lump sum payment (the "Severance Payment"), paid no later than 90 days after Associate's termination date, equal to:

    **a.**    For Associates with up to six (6) years of service, six (6) months Base Salary;

    **b.**    For Associates with seven (7) full years of service or more, one month's Base Salary for each year of service up to a maximum of the Associate's annual Base Salary.

**9.5**    <u>Termination by Associate.</u>  Associate may terminate his/her employment, or Associate may elect not to renew the Agreement, at any time for any reason. If Associate elects to terminate his/her employment, Associate agrees to give Academy at least fourteen (14) days' prior written notice of termination, specify the identity and location of Associate's intended future employer and the position he/she will be performing for that employer, and reasonably cooperate in transitioning Associate's work. All of Associate's rights and benefits provided for in this Agreement will terminate as of the date of such termination; *provided, however,* that Associate shall receive Associate's pro rata Base Salary as earned and unpaid through the date of termination. Associate also will be eligible to receive, at the same time as payments are made to other Associates of Academy, Incentive Compensation which Associate earned according to its terms (including any requirement to be employed by Academy on the date the payment is made) for the fiscal year preceding the date of his/her termination.

**10.**    <u>Notice of Termination, COBRA, and Conditions for Severance.</u>

    **10.1**    <u>Notice of Termination.</u>  Any notice of termination shall include the effective date and reason, if any, for such termination. In the event of any termination, the confidentiality, non-competition, non-solicitation and other obligations of Associate shall continue to apply in accordance with their terms.

    **10.2**    <u>COBRA.</u>  Regardless of the reason for termination, Associate is eligible to elect post-termination health benefits (COBRA) at Associate's expense, unless otherwise provided by law.

    **10.3**    <u>Conditions to Receiving any Severance or other Post-Employment Payments: Waiver and Release of Claims, Compliance with Agreement, and Cooperation in Transitioning Duties.</u> All payments made and benefits given under this Agreement are conditioned upon Associate's continued compliance with the terms of the Agreement. As a condition to Associate's right to receive any post-termination payments for Incentive Compensation or Severance Pay under this Agreement, Associate (or his/her estate where applicable) must execute and deliver to Academy a waiver and release, in a form created by or otherwise acceptable to Academy, of all claims he/she has, or may have, known or unknown, against Academy, any affiliated or parent companies, and their respective officers, employees, owners, directors, affiliates, representatives, shareholders, investors, and agents, which arise under or relate to this Agreement, or his/her employment with Academy or separation therefrom and any other matter which arises on or before the date of Associate's signature on such waiver and release. Any claims which arise after the date the waiver/release is signed or which are non-waivable as a matter of law, and any indemnity obligations, are not included in this waiver/release. This waiver/release shall be executed within 60 days following Associate's termination date . Associate shall forfeit all of his/her rights to any payments under this Agreement if the waiver/release is not executed within 60 days. Further, in order to receive any payments under this Agreement, Associate must comply with all obligations of this Agreement and shall not request that any of the restrictive covenants contained in this Agreement (as stated in Sections 11-15) be found unenforceable, overbroad, or void, and



Associate must cooperate with all reasonable requests to transition all work and Academy Relationships (defined below) in which he/she was involved during his/her employment with Academy. If the Associate challenges the enforceability or scope of any restrictive covenant of this Agreement in any regard or if any restrictive covenant of this Agreement is held to be unenforceable, overbroad, or void as a matter of law for any reason, the Associate agrees to forfeit all of his/her rights to post-termination or Severance Payments under this Agreement and to return any post-termination payments previously issued under this Agreement.

## CONFIDENTIAL INFORMATION

11.  Academy Confidential Information and Academy Relationships.

    **11.1**   Academy will provide Associate with Confidential Information and Relationships. In connection with and in furtherance of Associate's employment by Academy, and in return for Associate's promises herein, Academy will provide Associate with access to Academy's Confidential Information during the Term of his/her employment. Confidential Information includes, but is not limited to, any trade secret and anything reasonably designated as confidential, information pertaining to Academy's past, current and future business plans, corporate opportunities, operations, acquisition, merger or sale strategies, specialized Academy training, growth plans, product and service development, product specifications, product names and marks, services, marketing, cost and pricing structure, margins, profitability, sales data, partners, partnership or other business arrangements or agreements with third parties, customers, referral sources, sales numbers, vendor or supplier contracts, vendor or supplier histories, requirements or preferences or contact information, customer complaints or problems or issues, personnel information including compensation, performance, and contact information, books, records and documents, technical information, equipment, services and processes, information regarding affiliates, customers, clients, referral sources, employees, contractors, vendors and partners (collectively, "Confidential Information"). Academy will provide Associate with access to and opportunities with Academy and/or their vendors, suppliers, customers, clients, employees, contractors, referral sources and partners with whom Academy has developed goodwill and to which Associate would not otherwise have access (collectively, "Academy Relationships"). Information which is already publicly available through no fault of Associate is not considered Confidential Information.

    **11.2**   Value and Non-Disclosure/Non-Use of Confidential Information and Access to Academy Relationships. Associate acknowledges that Academy's businesses are highly competitive and that the Confidential Information and opportunities to develop relationships with Academy's vendors, suppliers, customers, clients, employees, contractors, referral sources, or partners are valuable, special, and unique assets of Academy which Academy uses in its businesses to obtain an advantage over competitors which do not have or use this information. Associate acknowledges that he/she will have knowledge of such Confidential Information and Academy Relationships in connection with his/her position with Academy. Associate further acknowledges that protection of the Confidential Information and Academy Relationships against unauthorized disclosure and use is of critical importance to Academy in maintaining its competitive position and is a material term of this Agreement. Accordingly, Associate hereby agrees that he/she will not, at any time during or after his/her employment by Academy, make any unauthorized disclosure of any Confidential Information or make any use thereof or of Academy Relationships, except (a) for the benefit of, and on behalf of, Academy or (b) as required to be disclosed pursuant to legal process (e.g., a subpoena), provided that Associate notifies Academy upon

6



receiving or becoming aware of the legal process in question so that Academy may have the opportunity to seek a protective or other order to restrict or prevent such disclosure.

**11.3** <u>Third-Party Information</u>. Associate acknowledges that, as a result of his/her employment by Academy, he/she will have access to, or knowledge of, confidential business information or trade secrets belonging to third parties, such as affiliates, subsidiaries, customers, clients, employees, contractors, vendors, suppliers, referral sources, partners, joint venturers, and the like, of Academy. Associate agrees to preserve and protect the confidentiality of such third-party confidential information and trade secrets to the same extent as, and on the same basis as, Academy's Confidential Information.

**11.4** <u>Return of Documents and Electronic Data</u>. All written, electronic, or other data or materials, records and other documents made by or coming into the possession of Associate which contain or disclose Confidential Information and/or Academy Relationships or otherwise discuss or contain information concerning Academy's businesses, whether or not Confidential Information, shall be and remain the property of Academy. Upon request, or without request upon termination of Associate's employment for any reason, Associate shall promptly deliver all information, electronic data or documents concerning Academy, including all copies, derivatives and extracts thereof, to Academy.

## NON-COMPETITION AND NON-SOLICITATION

**12.** <u>Consideration</u>. Associate acknowledges that the restrictive covenants contained in this Agreement are necessary to protect Academy's legitimate business interests in its Confidential Information (including Academy training) and Academy Relationships and that this Agreement would not have been entered into and no Confidential Information or Academy Relationships would be shared with Associate without Associate's consent to the terms in this Agreement. Associate's obligations under this Agreement are supported by the consideration to Associate from Academy specified in this Agreement.

**13.** <u>Non-Competition and Non-Solicitation Obligations</u>.

**13.1** <u>Non-Competition</u>. In exchange for the consideration specified herein and as a material incentive for Academy to enter this Agreement, Associate hereby agrees that he/she will not, directly or indirectly, for himself/herself or for others, anywhere in the United States, as an owner, investor, partner, shareholder, agent, representative, employee, officer, director, consultant, contractor, lender or otherwise (except for owning an investment interest of less than two percent (2%) in a publicly-traded company) participate, in a management capacity, in any business engaged primarily in the retail sale of sporting goods and outdoor products, including but not limited to the following companies and any of their successors, affiliates, or subsidiaries: Dick's Sporting Goods, Inc.; Cabela's Inc.; The Sports Authority, Inc.; Bass Pro Shops, Inc.; Gander Mountain Company; and Hibbett Sports, Inc. This restriction does not include (1) multi-purpose retailers, such as Wal-Mart Stores, Inc. and Target Corp., where the sale of sporting goods and outdoor products is less than 50% of total sales; and (2) any business engaged primarily in the retail sale of sporting goods and outdoor products with total sales from all sources (including retail stores, on-line, subsidiaries and affiliates) of less than $250 million. The period of this restriction (the "Restricted Period") begins on the Effective Date of this Agreement and ends one (1) year after Associate's employment with Academy terminates for any reason.

---



Associate Employment Agreement
Version 050712-1

**13.2**   Non-Solicitation of Vendors and Suppliers.  In exchange for the consideration specified in this Agreement and as a material incentive for Academy to enter into Agreement, Associate promises that during the Restricted Period, Associate shall not, on his/her own behalf or on behalf of any other person or entity anywhere in the United States, directly or indirectly, concerning any vendor or supplier with whom Associate had contact, or about whom Associate had Confidential Information while employed by Academy, solicit, influence, induce, or encourage to abandon, reduce or materially change the vendor's or supplier's business relationship with Academy.

**13.3**   Non-Solicitation of Employees.  Associate acknowledges that because of Academy's very specialized business and the nature of the Confidential Information, Academy Relationships, and training given to employees, Academy invests a significant amount of time and money in recruiting, training, and retaining its employees.  Associate further acknowledges that because of the Confidential Information, Academy Relationships, and specialized training Academy has provided to its employees, that loss of any of these employees to a competitor puts Academy at a competitive disadvantage.  In light of these acknowledgments, Associate promises that during the Restricted Period, Associate shall not, on his/her own behalf or on behalf of any other person or entity, hire or seek to hire any employee or independent contractor of Academy or in any other manner attempt directly or indirectly to solicit, influence, induce, or encourage any employee or independent contractor of Academy to leave the employment of Academy or to abandon, reduce or materially change its business relationship with Academy, nor shall he/she use or disclose to any person, partnership, entity, association, or corporation any information concerning the names, addresses, email information, or personal telephone numbers of any employees or independent contractors of Academy.

## INVENTIONS, DISCOVERIES AND COPYRIGHTS

**14.**   Inventions and Discoveries.  Associate irrevocably agrees to promptly and freely disclose to Academy, in writing, and Associate agrees to assign and hereby does assign to Academy, all rights, title and interest worldwide in and to any and all ideas, conceptions, inventions, improvements, and discoveries, whether patentable or not, which are conceived or made by Associate, solely or jointly with another, during the period of Associate's employment by Academy (whether during business hours or otherwise and whether on Academy's premises or otherwise) and which are related to the business or activities of Academy (including, without limitation, all such information relating to Academy's past, current and future business plans, corporate opportunities, operations, acquisition, merger or sale strategies, growth plans, production, product development, product names and marks, marketing, cost and pricing structure, margins, profitability, operation or production procedures or results, partners, partnership or other business arrangements or agreements with third parties, customers, customer sales volumes, customer contracts, books, records and documents, technical information, equipment, services and processes).  All drawings, memoranda, notes, records, files correspondence, manuals, models, specifications, computer programs, maps and all other writings or materials of any type embodying any of such information, ideas, concepts, improvements, discoveries, and inventions are and shall be the sole and exclusive property of Academy.  Associate agrees that, whenever requested to do so by Academy, he/she shall assist in the preparation of any document that Academy shall reasonably deem necessary and shall execute any and all applications, assignments or other instruments that Academy shall reasonably deem necessary, in its sole discretion, to apply for and obtain protection, including patent protection, for such ideas, conceptions, inventions, improvements and discoveries in all countries of the world.

**15.**   Copyrights.  If during Associate's employment by Academy, Associate creates any original work of authorship (each, a "Work") fixed in any tangible medium of expression which is the subject matter of



copyright (e.g., written presentations, computer programs, videotapes, drawings, maps, models, manuals or brochures) relating to Academy's business, products, or services, whether a Work is created solely by Associate or jointly with others, Academy shall be deemed the author of a Work if the Work is prepared by Associate in the scope of his/her employment; or, if the Work is not prepared by Associate within the scope of his/her employment but is specially ordered by Academy as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation or as an instructional text, then the Work shall be considered to be a work made for hire and Academy shall be the author of the Work.  In the event a Work is not prepared by Associate within the scope of his/her employment or is not deemed to be a work made for hire, then Associate hereby agrees to assign, and by these presents, does assign, to Academy all of Associate's worldwide right, title and interest in and to such Work and all rights of copyright therein. Both during the period of Associate's employment by Academy and thereafter, Associate agrees, at Academy's expense, to reasonably assist Academy and its nominee, at any time, in the protection of Academy's worldwide right, title and interest in and to the Work and all rights of copyright therein, including, but not limited to, the execution of all formal assignment documents reasonably requested by Academy or its nominee and the execution of all lawful oaths and applications for registration of copyright in the United States and foreign countries.

## MISCELLANEOUS

**16.**     _Restrictive Covenants._  Associate understands and agrees that the restrictions and obligations upon Associate contained in this Agreement are material to Academy and that this Agreement would not be entered into without these promises from Associate.  Associate acknowledges that these restrictions and obligations do not terminate when Associate's employment terminates.  It is expressly understood and agreed that Academy and Associate consider the restrictions and obligations upon Associate contained in this Agreement to be reasonable and necessary for the purposes of preserving and protecting the Confidential Information and Academy Relationships belonging to Academy and may be enforced by Academy to the fullest extent allowed by law. Associate understands that the foregoing restrictions may limit his/her ability to engage in a business similar to or competitive with Academy, but acknowledges that he/she has or will receive sufficient monetary and other consideration from Academy under this Agreement to justify such restriction.  Associate further acknowledges that the foregoing restrictions and obligations do not prevent him/her from earning a living with the skills and experiences he/she currently possesses.  Associate acknowledges that money damages would not be a sufficient remedy for any material breach of Sections 10 - 16 by Associate and as such, Academy shall be entitled to enforce the provisions by injunctive relief in addition to all remedies available at law or in equity.  Associate expressly acknowledges that the restrictive covenants in this Agreement constitute a reasonable restraint as to time, area, and activities involved, and further acknowledges and agrees that he/she shall not suffer an undue financial hardship thereby.  In consideration to Academy, without which Academy would not have entered into this Agreement, Associate hereby expressly waives, and agrees not to assert, any challenge to any restrictive covenant in this Agreement premised upon insufficiency of consideration, overbreadth or unreasonableness, and Associate further agrees to indemnify, and hold harmless, Academy, in conjunction with any such assertion.

**17.**     _Statements._  Associate shall refrain, both during the Term and after the Term expires, from making or publishing any oral or written statements that are false, slanderous, libelous, disparaging, or defamatory about Academy, and its respective officers, managers, partners, employees, shareholders, investors, directors, agents or representatives. This provision is for the benefit of and may be enforced by Academy via injunction or any other remedy at law or equity.



Associate Employment
Agreement

Version 050712-1

**18.**  <u>Successors/Assignment</u>.  Associate acknowledges and agrees that this Agreement shall be binding upon and inure to the benefit of Academy and any other person, association, or entity to which this Agreement may be assigned or which may hereafter acquire or succeed to all or substantially all of Academy's business or assets by any means whether direct or indirect, by purchase, merger, consolidation, or otherwise.  Academy shall require any successor to assume all of its obligations under this Agreement.  Associate's obligations under this Agreement are personal and may not be assigned, but they may be enforced by his/her heirs or executors.

**19.**  <u>Disclosures/Notices</u>.  For all disclosures and notices that Associate may provide to Academy during employment, such disclosure or notices shall be in writing and provided to:  (1) the Executive Committee member heading the Associate's business unit; and (2) the General Counsel.  All post-employment notices or other communications shall be in writing and shall be deemed to have been duly given when personally delivered or when mailed, faxed or otherwise delivered by any means which provides a receipt upon delivery and addressed as follows:

| | |
|---|---|
| If to Academy: | Academy Managing Company, L.L.C. |
| | 1800 North Mason Road |
| | Katy, Texas 77449 |
| | Attention:  General Counsel |
| If to Associate: | To the last available address on file at Academy for Associate |

or to such other address as either Party may furnish to the other in writing in accordance herewith, except that notices of changes of address shall be effective only upon receipt.

**20.   CHOICE OF LAW AND FORUM; WAIVER OF JURY TRIAL.  THE LAWS OF THE STATE OF TEXAS GOVERN THIS AGREEMENT AND ANY DISPUTES RELATED TO THIS AGREEMENT WITHOUT REFERENCE TO PRINCIPLES OF CHOICE OR CONFLICTS OF LAW.  EXCEPT WHERE INJUNCTIVE OR OTHER EMERGENCY RELIEF IS SOUGHT, THE PARTIES AGREE THAT, AS A CONDITION PRECEDENT TO ANY ACTION REGARDING DISPUTES ARISING UNDER THIS AGREEMENT, SUCH DISPUTES SHALL FIRST BE SUBMITTED TO MEDIATION BEFORE A PROFESSIONAL MEDIATOR SELECTED BY THE PARTIES, AT A MUTUALLY AGREED TIME AND PLACE, AND WITH THE MEDIATOR'S FEES SPLIT EQUALLY BETWEEN THE PARTIES.  IF MEDIATION IS UNSUCCESSFUL, THE PARTIES AGREE TO SUBMIT ALL DISPUTES TO THE EXCLUSIVE JURISDICTION OF THE STATE OR FEDERAL COURTS IN HARRIS COUNTY, TEXAS.  ASSOCIATE AND ACADEMY WAIVE ANY RIGHTS TO A TRIAL BY JURY.**

**21.**  <u>No Waiver</u>.  No failure by either Party hereto at any time to give notice of any breach by the other Party of, or to require compliance with, any condition or provision of this Agreement shall (i) be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time or (ii) preclude insistence upon strict compliance in the future.

**22.**  <u>Severability and Modification</u>.  If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of that provision shall not affect the validity or enforceability of any other provision of this Agreement, and all other provisions shall remain in full force and effect.  To the extent that the invalid or unenforceable provision may be modified or rewritten to become valid and enforceable, the Parties agree to such modification or rewriting without affecting the enforceability or validity of the remaining terms of this Agreement.



**23.** _Counterparts._ This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

**24.** _Withholding of Taxes and Other Items._ Academy may withhold from any compensation or benefits payable under this Agreement all federal, state, city or other taxes as may be required pursuant to any law or governmental regulation or ruling. Furthermore, should Associate owe Academy any money at the time of termination of employment, Associate authorizes and consents to Academy deducting the amount owed by Associate from any form of compensation otherwise owed to Associate.

**25.** _Tax Liability._ Other than payroll withholdings required by law, Academy makes no representations to Associate regarding any tax liabilities he/she may incur, including, but not limited to, any application of or taxes incurred under Section 409A, because of any payments made to him/her under this Agreement, any bonus or incentive plan, or otherwise. Associate is advised to obtain his/her own legal counsel regarding all tax matters and represents that he/she has consulted with legal counsel of his/her choosing to the extent he/she desires.

**26.** _Section 409A._

    **26.1** _Application._ To the extent applicable, it is intended that this Agreement comply with the provisions of Section 409A, so as to prevent inclusion in gross income of any amounts payable or benefits provided hereunder in a taxable year that is prior to the taxable year or years in which such amounts or benefits would otherwise actually be distributed, provided or otherwise made available to Associate. This Agreement shall be construed, administered, and governed in a manner consistent with this intent and the following provisions of this paragraph shall control over any contrary provisions of this Agreement.

    **26.2** _Separation from Service._ Payments and benefits hereunder upon Associate's termination or severance of employment with Academy that constitute deferred compensation under Section 409A shall be paid or provided only at the time of a termination of Associate's employment that constitutes a "separation from service" within the meaning of Section 409A.

    **26.3** _Release Payments._ In the event that Associate is required to execute a release to receive any payments from Academy that constitute nonqualified deferred compensation under Section 409A, payment of such amounts shall not be made or commence until the ninetieth (90th) day following such termination of employment. Any payments that are suspended during the ninety (90) day period shall be paid on the date the first regular payroll is made immediately following the end of such period.

    **26.4** _Separate Payments._ For purposes of Section 409A, each payment under this Agreement shall be treated as a right to a separate payment for purposes of Section 409A.

    **26.5** _Reimbursements._ All reimbursements and in kind benefits provided under this Agreement shall be made or provided in accordance with the requirements of Section 409A, including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during Associate's lifetime (or during a shorter period of time specified in this Agreement), (ii) the amount of expenses eligible for reimbursement, or in kind benefits provided during a calendar year may not affect the expenses eligible for reimbursement or in kind benefits to be provided in any other calendar year, (iii) the reimbursement of an eligible expense will be made on or before the last day of the calendar year following the year in which the expense is incurred, and (iv) the



right to reimbursement or in kind benefits is not subject to liquidation or exchange for another benefit.

**27.**    Headings. The paragraph headings have been inserted for purposes of convenience and shall not be used for interpretive purposes.

**28.**    Affiliate. As used in this Agreement, "affiliate" shall mean any person or entity which, directly or indirectly, through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, Academy or with any other entity to which the reference was made.

**29.**    Entire Agreement; No Oral Modifications of Agreement. This Agreement constitutes the entire agreement of the Parties with regard to Associate's employment with Academy, and contains all the covenants, promises, representations, warranties and agreements between the Parties with respect to employment of Associate by Academy. All prior and/or contemporaneous verbal and written agreements between the Parties regarding Associate's employment with Academy are superseded or replaced in their entirety, except that any non-disclosure, non-solicitation or non-compete obligations provided under any prior agreement or under common law shall remain in place and shall be supplemented by the non-disclosure, non-solicitation and non-compete obligations in this Agreement. Each Party to this Agreement acknowledges that no representation, inducement, promise or agreement, oral or written, has been made by either Party, or by anyone acting on behalf of either Party, which is not embodied herein, and that no agreement, statement, or promise relating to the employment of Associate by Academy, which is not contained in this Agreement, shall be valid or binding. Any modification of this Agreement will be effective only if it is in writing and signed by the Party to be charged.

**30.**    Survival. The restrictions and obligations on Associate in this Agreement, including those in Sections 10 – 18 and any indemnity obligations, shall survive termination of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the Effective Date.

**[signature page to follow]**

Unofficial Copy Office of Harris County District Clerk



## ACADEMY

ACADEMY, LTD., d/b/a
ACADEMY SPORTS + OUTDOORS

By: ACADEMY MANAGING CO., L.L.C.,
    its General Partner

By: _____

Printed Name: WILLIAM S. ENNIS

Title: SVP HUMAN RESOURCES

Date: 6/1/12

## ASSOCIATE

Printed Name: Chee Lee

Date: 5/25/12

Unofficial Copy Office of Marilyn Burgess District Clerk

13

*CONFIDENTIAL*
*2018 Non-Executive Form*

## NEW ACADEMY HOLDING COMPANY LLC
## UNIT OPTION AWARD AGREEMENT

THIS UNIT OPTION AWARD AGREEMENT (this "Award"), made by and between New Academy Holding Company LLC, a Delaware limited liability company (hereinafter referred to as the "Company"), and the individual whose name is set forth on the Master Signature Page attached to this Award (the "Grantee"), is entered into as of the "Grant Date" set forth on such Master Signature Page (the "Grant Date"). Any capitalized terms used but not otherwise defined herein shall have the meaning set forth in the New Academy Holding Company LLC 2011 Unit Incentive Plan, as amended, modified or supplemented from time to time (the "Plan").

WHEREAS, as an incentive for the Grantee's efforts in connection with his or her Employment by, or performance of other services for, the Company (or its Affiliates, as applicable), the Company wishes to afford the Grantee the opportunity to purchase a number of Membership Units (which Membership Units shall entitle the Grantee to any and all rights and benefits to which the holder of such Membership Units may be provided under the LLC Agreement and the Delaware Limited Liability Company Act), subject to the terms and conditions set forth herein and in the Plan; and

WHEREAS, the Company wishes to carry out the Plan, the terms of which are hereby incorporated by reference and made a part of this Award, pursuant to which the Committee, appointed to administer the Plan, has instructed the undersigned officers to issue the Options granted hereunder.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, this Award shall be granted in accordance with and subject to the terms and conditions as follows:

### ARTICLE I

### DEFINITIONS

Whenever the following terms are used in this Award, they shall have the meaning specified below unless the context clearly indicates to the contrary.

Section 1.1.    Cause

"Cause" means "Cause" as defined and determined in the Employment Agreement, if any, or if the Grantee has no Employment Agreement or the term "Cause" is not defined in the Employment Agreement, "Cause" shall mean the (i) Grantee's act of dishonesty or disloyalty (including, but not limited to, fraud, misrepresentation, embezzlement or misappropriation), (ii) Grantee's failure to timely or sufficiently perform any material and reasonable duties assigned to him/her, (iii) Grantee's failure to reach the material and reasonable goals set forth for the Grantee, including poor performance and/or failure to achieve an acceptable performance rating, (iv) Grantee's breach of any policy of Academy, Ltd., including but not limited to all employment, ethics, conflict of interest, and code of conduct policies, (v) Grantee's drug or alcohol abuse, (vi) Grantee's conviction, guilty plea, no contest plea, deferred adjudication or other trial diversion regarding any felony or any crime involving moral turpitude, or (vii) Grantee's willful disregard of any material and reasonable directive, or material misconduct with respect to the business or affairs of Academy, Ltd., including any act or acts which adversely affect its image or reputation or which result in material financial loss to Academy, Ltd.

351958

**EXHIBIT B**

Section 1.2.     Demotion

"Demotion" shall mean the demotion of the Grantee to an Employment position which is not then eligible for grants of options or to a position that is eligible for option grants at a lower level than the level for which the Grantee was eligible on the Grant Date.

Section 1.3.     Disability

"Disability" means "Disability" as defined in and determined under the Employment Agreement, if any, or if the Grantee has no Employment Agreement or the term "Disability" is not defined in the Employment Agreement, shall mean a physical or mental illness, incapacity or disability which has prevented the Grantee from substantially performing the Grantee's material duties for a period of one-hundred and eighty (180) consecutive days.

Section 1.4.     Earned

"Earned" means eligible to become vested and exercisable in accordance with the vesting provisions set forth on **Appendix B** attached hereto.

Section 1.5.     Earned Percentage

"Earned Percentage" has the meaning ascribed to such term in **Appendix B** attached hereto.

Section 1.6.     EBITDA

"EBITDA" means operating earnings before interest, taxes, depreciation and amortization, excluding transaction, management and/or similar fees paid to the Sponsor and/or its Affiliates. The Committee shall, fairly and appropriately, adjust the calculation of EBITDA to reflect, to the extent not contemplated in the management plan, the following: acquisitions, divestitures, any change required by GAAP relating to Membership Unit-based compensation or for other changes in GAAP promulgated by accounting standard setters and any extraordinary items that, in each case, the Committee in good faith determines require adjustment of EBITDA. The Committee's determination of such adjustment shall be based on the Company's accounting as set forth in its books and records and on the financial plan of the Company pursuant to which the performance target was originally established.

Section 1.7.     Employed or Employment

"Employed" or "Employment" means employment by the Company or any of its Affiliates as an employee or the performance of services (whether as employee, consultant, director or member or other service provider) to the Company.

Section 1.8.     Employment Agreement

"Employment Agreement" means that certain associate employment agreement or other employment agreement, if any, specifying the terms of the Grantee's Employment by the Company, Academy, Ltd. and/or any of their respective Affiliates, as applicable, as the same may be amended from time to time in accordance with its terms.

Section 1.9.     Exercise Price

"Exercise Price" means the price at which a Membership Unit may be purchased upon the exercise of the Options. For all purposes hereunder, the Exercise Price of the Options shall initially be the Exercise Price set forth on Section B of the Master Signature Page attached hereto (which is the Fair

351958

Market Value per Membership Unit on the Grant Date) and shall thereafter be subject to adjustment pursuant to the Plan.

Section 1.10.    Grant Year

"Grant Year" has the meaning ascribed to such term in **Appendix B** attached hereto.

Section 1.11.    Grant Year High Performance Target

"Grant Year High Performance Target" has the meaning ascribed to such term in **Appendix B** attached hereto.

Section 1.12.    Grant Year Low Performance Target

"Grant Year Low Performance Target" has the meaning ascribed to such term in **Appendix B** attached hereto.

Section 1.13.    New Position

"New Position" shall have the meaning ascribed to such term in Section 3.3.

Section 1.14.    Options

"Options" means the options to purchase any part or all of an aggregate of the number and series of Membership Units granted to the Grantee under Section 2.1 of this Award. For all purposes hereunder, the Options shall include the Time Options and/or Performance Options set forth on Section B of the Master Signature Page attached hereto; provided, however, that the Master Signature Page attached hereto may set forth that zero (0) Time Options or Performance Options are granted to the Grantee hereunder.

Section 1.15.    Performance Options

"Performance Options" means the Performance Options set forth on Section B of the Master Signature Page attached hereto, if any, which are granted to the Grantee pursuant to Section 2.1 of this Award.

Section 1.16.    Prior Year Performance Amount

"Prior Year Performance Amount" has the meaning ascribed to such term in **Appendix B** attached hereto.

Section 1.17.    Target Unit Price

"Target Unit Price" has the meaning ascribed to such term in **Appendix B** attached hereto.

Section 1.18.    Target Vesting Year

"Target Vesting Year" means, with respect only to the Performance Options, if any, the Target Vesting Year set forth on Section B of the Master Signature Page attached hereto; provided, however, that the Master Signature Page attached hereto shall not require a Target Vesting Year to the extent that Performance Options are not granted to the Grantee hereunder.

351958

Section 1.19.    Time Options

"Time Options" means the Time Options set forth on Section B of the Master Signature Page attached hereto, if any, which are granted to the Grantee pursuant to Section 2.1 of this Award.

ARTICLE II

GRANT OF OPTIONS

Section 2.1.    Grant of Options; Exercise Price

For good and valuable consideration, upon the terms and conditions set forth herein and in the Plan, on and as of the Grant Date, the Company grants to the Grantee options to purchase any part or all of an aggregate of the number and series of Membership Units set forth on Section B of the Master Signature Page attached hereto, at the Exercise Price, without commission or other charge.

ARTICLE III

PERIOD OF EXERCISABILITY

Section 3.1.    Vesting and Commencement of Exercisability

(a)    *Time Options.*  Subject to Section 3.1(d)(i) and so long as the Grantee continues to be Employed through the relevant vesting dates, the Time Options shall become vested and exercisable based on elapsed time, such that the percentages of the Time Options set forth in the table entitled Time Options Vesting Schedule on **Appendix A** attached hereto shall become vested and exercisable on each of the corresponding vesting dates set forth in such table.

(b)    *Performance Options.*  Subject to Section 3.1(d)(ii) and so long as the Grantee continues to be Employed through the relevant vesting event, the Performance Options shall become Earned based on the Company's level of achievement of consolidated annual EBITDA for the Grant Year and thereafter become vested and exercisable based on elapsed time, in accordance with the terms set forth on **Appendix B** attached hereto, such that the portion of the Performance Options that has been Earned shall become vested and exercisable on the vesting date required by the section entitled Earned Performance Options Vesting Schedule on **Appendix B** attached hereto; provided that, for the avoidance of doubt, no portion of the Performance Options shall become Earned (and thereby become eligible to become vested and exercisable), unless the Grantee remains Employed through the date on which the Committee determines that the applicable condition(s) to becoming Earned has been satisfied, in accordance with the terms set forth on **Appendix B** attached hereto.

(c)    *Death or Disability.*  Notwithstanding any of the foregoing, upon a termination of the Grantee's Employment at any time by reason of death or Disability:

(i)    The portion of the Time Options that would have become vested and exercisable on the vesting date of the Time Options immediately following the date of such termination, had the Grantee remained Employed through such vesting date, will become vested and exercisable as of such termination; and

(ii)    To the extent Earned as of the date of such termination, the portion of the Performance Options that would have become vested and exercisable on the vesting date of the Performance Options immediately following the date of such termination, had the Grantee remained Employed through such vesting date, will become vested and exercisable as of such termination.

351958

(d)     *Change of Control.*   Notwithstanding any of Sections 3.1(a) or 3.1(b), in connection with any Change of Control:

(i)     Any then-outstanding and unvested portion of the Time Options shall become vested and exercisable as to one hundred percent (100%) of the Membership Units that are subject to such unvested portion, immediately prior to such Change of Control; and

(ii)     (A) If such Change of Control occurs during the Grant Year, then any then-outstanding and unvested portion of the Performance Options shall become vested and exercisable as to one hundred percent (100%) of the Membership Units that are subject to such unvested portion, immediately prior to such Change of Control.

(B) If such Change of Control occurs following the Grant Year, then any then-outstanding and unvested portion of the Performance Options that has been Earned as of immediately prior to such Change of Control shall become vested and exercisable as to one hundred percent (100%) of the Membership Units that are subject to such unvested portion, immediately prior to such Change of Control, and any portion of the Performance Options that has not been Earned as of immediately prior to such Change of Control shall be automatically forfeited upon the consummation of such Change of Control.

Section 3.2.     Expiration of Options

The Grantee may not exercise the exercisable portion of the Options to any extent and the unexercised portion of the Options shall lapse, upon the first to occur of the following events:

(a)     the tenth anniversary of the Grant Date;

(b)     the first anniversary of the date of the Grantee's termination of Employment, if the Grantee's Employment is terminated by reason of death or Disability; or

(c)     one hundred eighty (180) days after the date of an Grantee's termination of Employment by the Company or its Affiliates without Cause (for any reason other than as set forth in Section 3.2(b)); or

(d)     immediately upon the date of the Grantee's termination of Employment by the Company or its Affiliates for Cause; or

(e)     thirty (30) days after termination of Employment by the Grantee (for any reason other than as set forth in Section 3.2(b)); or

(f)     the date the Options is terminated pursuant to Section 5.1 or 5.2 of the Management Unitholder's Agreement; or

(g)     if the Committee so determines pursuant to Section 7 or 8 of the Plan.

Section 3.3.     Demotion

No portion of the Options which has not become vested and exercisable at the date of the Grantee's Demotion shall thereafter become vested and exercisable; provided, that in the event of Demotion to a position that is eligible for option grants at a lower level than the level for which the Grantee was eligible on the Grant Date (the "New Position"), then the Grantee acknowledges and agrees that (a) the terms of the foregoing shall apply only to that part (if any) of the portion of the Options which

has not become vested and exercisable and exceeds the minimum number of options to which the New Position is eligible and (b) the Company may, in its sole discretion, further adjust (e.g., increase or reduce) the portion of the Options which has not become vested and exercisable at the date of the Grantee's Demotion if, in its sole judgment, such further adjustment is appropriate; provided, further, that this Section 3.3 does not permit the Company to make an adjustment that results in an increase in the number of Membership Units subject to the Options that is greater than the number of Membership Units subject to each such portion of the Options granted pursuant to Section 2.1 and set forth on Section B of the Master Signature Page attached hereto. Notwithstanding anything to the contrary in the foregoing, the Company may, in its sole discretion, waive or adjust any portion of the terms of the immediately preceding sentence in the event of Demotion due to the transfer, illness or disability of the Grantee, the occurrence of a force majeure event (including without limitation acts of God, strikes or labor disturbances) affecting the Grantee's position or other similar circumstances.

ARTICLE IV

EXERCISE OF OPTION

Section 4.1.    Person Eligible to Exercise

Except as expressly provided for herein, the Plan or in the Management Unitholder's Agreement, during the lifetime of the Grantee (other than in the case of the Disability of the Grantee), only the Grantee may exercise the Options or any portion thereof.  After the Disability or death of the Grantee, any exercisable portion of the Options may, prior to the time when the Options becomes unexercisable under Section 3.2, be exercised by the Grantee's legatees, personal representatives, or distributees.

Section 4.2.    Partial Exercise

Any exercisable portion of the Options or the entire Options, if then wholly exercisable, may be exercised in whole or in part at any time prior to the time when the Options or portion thereof becomes unexercisable under Section 3.2; provided, that any partial exercise shall be for whole Membership Units only.

Section 4.3.    Manner of Exercise

The Options, or any exercisable portion thereof, may be exercised solely by delivering to the Secretary of the Company all of the following on or prior to the time when the Options or such portion becomes unexercisable under Section 3.2, and the satisfaction of all of the foregoing shall be determined in the discretion of the Company:

(a)    notice in writing signed by the Grantee or any other person then entitled to exercise the Options or portion thereof, stating that the Options or portion thereof is thereby exercised, such notice complying with all applicable rules established by the Committee;

(b)    full payment of the exercise price applicable to any Options in cash, by check, in Membership Units (any such Membership Units valued at Fair Market Value on the date of exercise) that the Grantee has held for at least six months (or such lesser period of time as may be required by the Company's accountants), through the withholding of Membership Units (any such Membership Units valued at Fair Market Value on the date of exercise) otherwise issuable upon the exercise of the Options in a manner that is compliant with applicable law, or a combination of the foregoing methods;

(c)    full payment in cash of any taxes due in respect of such exercise in cash, except that upon any termination of the Grantee's Employment under a circumstance described in Section 3.2(b) or (c)

351958

above, the Grantee may make payment of any such taxes under any method described in Section 4.3(b) above;

(d)       execution and delivery to the Company, to the extent not so previously executed and delivered, of the Management Unitholder's Agreement and such other documents and instruments as may be reasonably required by the Committee;

(e)       full payment to the Company of all amounts which, under federal, state or local law, it (or an Affiliate) is required to withhold upon exercise of the Options, except as otherwise agreed to by the Company under the Plan;

(f)       in the event the Options or portion thereof shall be exercised pursuant to Section 4.1 by any person or persons other than the Grantee, appropriate proof of the right of such person or persons to exercise the option; and

(g)       if so requested by the Committee, an irrevocable voting proxy and power of attorney in favor of a designated member of the Board.

In addition, following an IPO, the Grantee may satisfy his or her obligations under Section 4.3(b) and/or (c) through the sale of Membership Units (or equity securities into which Membership Units are convertible) into the public market pursuant to a cashless exercise program that is compliant with applicable law, to the extent the sale of such Membership Units (or equity securities, as applicable) is permitted under the Management Unitholder's Agreement.

Without limiting the generality of the foregoing, the Committee may require an opinion of counsel acceptable to it to the effect that any subsequent transfer of Membership Units acquired on exercise of the Options does not violate the Securities Act of 1933, as amended, and may issue stop-transfer orders covering such Membership Units.

Section 4.4.       Conditions to Issuance of Membership Units

The Company shall not be required to record the ownership by the Grantee of Membership Units purchased upon the exercise of the Options or portion thereof prior to fulfillment of all of the following conditions:

(a)       the obtaining of approval or other clearance from any federal, state, local or non-U.S. governmental agency which the Committee shall, in its reasonable and good faith discretion, determine to be necessary;

(b)       the lapse of such reasonable period of time following the exercise of the Options as may otherwise be required by applicable law; and

(c)       the execution and to the Company, to the extent not so previously executed and delivered, of the Management Unitholder's Agreement and such other documents and instruments as may be reasonably required by the Committee.

Section 4.5.       Rights as Unitholder; Member

The Grantee shall not be, and shall not have any of the rights or privileges of, unitholders or members of the Company in respect of any Membership Units purchasable upon exercise of the Options or any portion thereof unless and until a book entry representing such Membership Units has been made on the books and records of the Company and the Grantee has been admitted as a member pursuant to the terms of the LLC Agreement; *provided*, that the Grantee shall be deemed to be admitted as a member,

351958

retroactive to the date of exercise of the Options, once the criteria contained in Sections 4.3 and 4.4 hereof have been satisfied.

ARTICLE V

<u>MISCELLANEOUS</u>

Section 5.1.    <u>Administration</u>

The Committee shall have the power to interpret the Plan and this Award and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret or revoke any such rules and all actions taken and all interpretations and determinations made by the Committee in good faith shall be final and binding upon the Grantee, the Company and all other interested persons; <u>provided</u>, that the foregoing powers shall not govern any determinations of "Cause" or "Disability" for purposes of this Award, which shall instead be subject to dispute pursuant to Section 5.6. In its absolute discretion, the Board may at any time and from time to time exercise any and all rights and duties of the Committee under the Plan and this Award; <u>provided</u>, that in no event may the Board or Committee terminate the Plan or the Options other than pursuant to Section 7 or 8 of the Plan or the Management Unitholder's Agreement without the Grantee's written consent.

Section 5.2.    <u>Notices</u>

Any notice to be given under the terms of this Award to the Company shall be addressed to the Company in care of the Secretary, and any notice to be given to the Grantee shall be addressed to the Grantee at the address set forth in the Company's books and records.  By a notice given pursuant to this Section 5.2, either party may hereafter designate a different address for notices to be given to that party. Any notice which is required to be given to the Grantee, shall, if the Grantee is then deceased, be given to the Grantee's personal representative if such representative has previously informed the Company of the representative's status and address by written notice under this Section 5.2.

Section 5.3.    <u>Options Subject to Plan and Management Unitholder's Agreement; Survival of Terms; Conflicts</u>

The Options, and the Membership Units issued to the Grantee upon exercise of the Options, shall be subject to all of the terms and provisions of the Plan and the Management Unitholder's Agreement, to the extent applicable to the Options and such Membership Units, and all such applicable terms are hereby incorporated by reference and made a part hereof, including, without limitation, those provisions contained in Sections 4, 5 and 7 of the Management Unitholder's Agreement. In the event of any conflict between this Award and the Management Unitholder's Agreement, the Management Unitholder's Agreement shall control. This Award also remains subject to the terms of the Plan, and, in the event of any conflict between specific provisions of the Plan and the Award, the Plan shall control.  The provisions of the Award shall survive the termination of the Award to the extent consistent with, or necessary to carry out, the purposes thereof.

Section 5.4.    <u>Amendment</u>

Subject to Section 9 of the Plan, this Award may be amended only by a writing executed by the parties hereto, which specifically states that it is amending this Award.

Section 5.5.    <u>Governing Law</u>

This Award shall be governed in all respects by the laws of the State of Delaware, without giving effect to the principal of conflict of laws.

Section 5.6.    Disputes

Notwithstanding anything in the Plan to the contrary, any dispute with regard to the enforcement of this Award shall be exclusively resolved pursuant to the dispute resolution procedures set forth in the Employment Agreement, if any, or if the Grantee has no Employment Agreement or if no such procedures exist therein, pursuant to Section 14(h) of the Plan; provided, that any arbitration conducted pursuant to Section 14(h) of the Plan shall be conducted in the State of Texas.

Section 5.7.    Conformity to Section 409A

It is intended that the Options either be exempt from or comply with Section 409A, and this Award shall be interpreted accordingly. The Committee shall use commercially reasonable efforts to implement the provisions of this Section 5.7 in good faith; provided, that none of the Company, the Board, the Committee nor any of the Company's employees, directors or representatives shall have any liability to Participants with respect to this Section 5.7 to the extent administered in accordance therewith.

Section 5.8.    No Right of Employment or Service

Nothing contained herein shall confer on the Grantee any right to be continued in the Employ or service of the Company and/or any Affiliate, constitute any contract or agreement of Employment or other service or affect an employee's status as an at-will employee, nor shall anything contained herein affect any rights which the Company and/or an Affiliate may have to change the Grantee's compensation or other benefits or terminate such person's Employment or association with the Company and/or its Affiliate for any reason (with or without Cause, with or without compensation) at any time.

Section 5.9.    Counterparts

This Award may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

Section 5.10    Electronic Delivery

The Company may, in its sole discretion, decide to deliver any documents related to this Award by electronic means. The Grantee hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an online or electronic system established and maintained by the Company or a third party designated by the Company. In the event that any information regarding the Options provided to the Grantee through the stock plan administrator's web portal or otherwise conflicts with any of the terms and conditions of this Award, the Plan or the Management Unitholder's Agreement (collectively, the "*Award Governing Documents*"), the Award Governing Documents shall control.

> \* \* \* \* \*
>
> **This Unit Options Award Agreement between the Company and the Grantee named on the Master Signature Page attached hereto is dated and executed as of the date set forth on such Master Signature Page.**
>
> \* \* \* \* \*

351958

## Appendix A

Time Options Vesting Schedule

| The following percentages of the Time Options: | Shall become vested and exercisable on the following corresponding anniversaries of the Grant Date: |
|---|---|
| 25% | First anniversary of the Grant Date |
| 25% | Second anniversary of the Grant Date |
| 25% | Third anniversary of the Grant Date |
| 25% | Fourth anniversary of the Grant Date |

351958

## Appendix B
### Performance Targets

Subject to Section 3.1(d)(ii) of the Agreement, the Performance Options shall become Earned with respect to a percentage of Membership Units that are subject to the Performance Options based on the Company's level of achievement of consolidated annual EBITDA for the 2018 fiscal year, which shall be the 52-week period ending on February 2, 2019 (such 52-week period, the "Grant Year"), in accordance with the following terms and conditions.

- If the Company's actual consolidated annual EBITDA for the Grant Year is equal to or greater than $353.8 million, which amount is the Company's target consolidated annual EBITDA for the Grant Year (such amount, the "Grant Year High Performance Target"), then one hundred percent (100%) of the Performance Options shall be Earned.

- If the Company's actual consolidated annual EBITDA for the Grant Year is less than the Grant Year High Performance Target but equal to or greater than $339.9 million (such amount, the "Grant Year Low Performance Target"), then the portion of the Performance Options that shall be Earned shall be equal to a percentage, rounded to two decimal places (the "Earned Percentage"), calculated based on a fraction wherein the numerator is equal to the difference between (i) the Company's actual consolidated annual EBITDA for the Grant Year and (ii) $332.0 million, which amount was the Company's consolidated annual EBITDA for the 2017 fiscal year (the "Prior Year Performance Amount"), and the denominator is equal to the difference between (i) the Grant Year High Performance Target and (ii) the Prior Year Performance Amount. The number of Membership Units that are subject to the Performance Options that shall be so Earned shall be equal to an amount determined by multiplying (x) the Earned Percentage, by (y) the number of Membership Units that are subject to the Performance Options granted (rounded down to the nearest whole share).

The illustrative example below assumes that the Company's actual consolidated annual EBITDA for the Grant Year is equal to $345.0 million. Based on such assumption, 59.6% of the Membership Units that are subject to the Performance Options shall be Earned.

$$\frac{\text{(Actual consolidated annual EBITDA for the Grant Year} - \text{Prior Year Performance Amount)}}{\text{(Grant Year High Performance Target} - \text{Prior Year Performance Amount)}} \quad \text{or} \quad \frac{(\$345.0 - \$332.0)}{(\$353.8 - \$332.0)} = 59.6\%$$

- If the Company's actual consolidated annual EBITDA for the Grant Year is less than the Grant Year Low Performance Target, then none (0.00%) of the Membership Units that are subject to the Performance Options shall be Earned.

- All determinations and interpretations relating to the Company's achievement of the Grant Year Low Performance Target and/or the Grant Year High Performance Target and the Fair Market Value of each Membership Unit of the Company shall be made in good faith by the Committee, and all determinations and interpretations made in good faith by the Committee shall be final and binding upon the Grantee and all other interested persons.

### Earned Performance Options Vesting Schedule

- If the Target Vesting Year of the Performance Options is 2019, then the portion of the Performance Options that has been Earned shall become vested and exercisable on the date of determination by the Committee of the Company's actual consolidated annual EBITDA for the Grant Year.

- If the Target Vesting Year of the Performance Options is 2020, then the portion of the Performance Options that has been Earned shall become vested and exercisable on the first anniversary of the last day of the Grant Year.

- If the Target Vesting Year of the Performance Options is 2021, then the portion of the Performance Options that has been Earned shall become vested and exercisable on the second anniversary of the last day of the Grant Year.

- If the Target Vesting Year of the Performance Options is 2022, then the portion of the Performance Options that has been Earned shall become vested and exercisable on the third anniversary of the last day of the Grant Year.

Notwithstanding the foregoing and subject to Section 3.1(d)(ii), if (i) any portion of the Performance Options that has not been Earned remains outstanding and unvested as of February 2, 2022, and (ii) the Committee determines that the Fair Market Value of a Membership Unit of the Company as of such date equals or exceeds $11.40 (the "Target Unit Price"), then one hundred percent (100%) of the portion of the Performance Options that has not been Earned as of such date shall become vested and exercisable immediately upon such determination by the Committee. For the avoidance of doubt, no portion of the Performance Options may become vested pursuant to this paragraph following a termination of the Grantee's employment (including, without limitation, a termination due to death or Disability in accordance with Section 3.1(c)(ii)).

351958